UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

ROBERT M. MCDEVITT,        :
                    :
      Plaintiff,    :
                    :
    v.                :    Civil Action No. 12-1297 (GK)
                    :
WELLS FARGO BANK, N.A.,   :
                    :
      Defendant.    :

## MEMORANDUM OPINION

Plaintiff Robert M. McDevitt ("McDevitt" or "Plaintiff") brings this diversity action against Wells Fargo Bank, N.A. ("Wells Fargo" or "Defendant") for wrongful foreclosure, breach of contract, and negligent infliction of emotional distress.

This matter is before the Court for reconsideration of Defendant's Motion for Summary Judgment [Dkt. No. 19] and Plaintiff's Motion for Summary Judgment on Liability and Partial Summary Judgment on Damages [Dkt. No. 20]. Upon consideration of the parties' Amended Joint Statement of Stipulated Facts [Dkt. No. 31] and reconsideration of the Motions, Oppositions, Replies, and the entire record herein, and for the reasons stated below, the Court **grants** Wells Fargo's Motion and **denies** Plaintiff's Motion.

## I.   BACKGROUND

### A.   Factual Background[1]

#### 1.   The Note and Deed of Trust

On July 18, 2003, McDevitt executed a 30-year Adjustable Rate Mortgage Note ("Note") and Deed of Trust with World Savings Bank for a $520,000 loan to purchase a private residence at 211 C St. NE in Washington D.C. (the "Property").  The loan had an indexed interest rate that changed monthly and a monthly payment that changed annually on September 1 of each year. See Affidavit of Robert M. McDevitt, Ex. A (Note) ¶ 2 [Dkt. No. 1-2].

At Paragraph 3 of the Note, McDevitt agreed that:

I will pay Principal and interest by making payments every month.

I will make my monthly payments on the 1st day of each month beginning on September 01, 2003.  I will make these payments every month until I have paid (i) all the Principal and interest, and (ii) any other charges described below that I may owe under this Note, and (iii) any charges that may be due under the Security Instrument[.]

The Note provided that McDevitt would be obligated to pay a late charge if he did not pay his monthly payment within 15 calendar days of the date it was due, and also that any failure to pay

---

[1]   Unless otherwise noted, the facts set forth herein are undisputed and drawn from the parties' Amended Joint Statement of Stipulated Facts [Dkt. No. 31].

the monthly payment on the due date constituted a default, permitting the lender to accelerate the loan.  Note ¶ 7(A)-(C).

McDevitt had the right to make advance payments on his mortgage, subject to certain restrictions.  Paragraph 5 of the Note stated:

> I HAVE THE RIGHT TO MAKE PAYMENTS OF PRINCIPAL AT ANY TIME BEFORE THEY ARE DUE.  A PAYMENT OF PRINCIPAL BEFORE IT IS DUE IS CALLED A "PREPAYMENT."  WHEN I MAKE A PREPAYMENT, I WILL TELL THE LENDER IN WRITING THAT I AM DOING SO.  THE LENDER MAY REQUIRE THAT ANY PARTIAL PREPAYMENT BE MADE ON THE SAME DATE THAT A PAYMENT IS DUE. . . .  IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATES OR AMOUNTS OF MY PAYMENTS UNLESS THE LENDER AGREES IN WRITING TO THOSE CHANGES[.]

Note ¶ 5 (emphasis in original).

### 2.    The April 14, 2008 Payment at Wachovia Bank

World Savings Bank (the holder of McDevitt's Note) was subsequently acquired by Wachovia Corporation and, in late 2007, changed its name to Wachovia Mortgage, FSB ("Wachovia Mortgage").  Wachovia Corporation also owned Wachovia Bank, N.A ("Wachovia Bank").  Wachovia Bank and Wachovia Mortgage were separate legal entities, but had a servicing agreement, which enabled a Wachovia Mortgage customer to submit mortgage payments at Wachovia Bank.

On April 14, 2008, McDevitt went to a Wachovia Bank branch on Pennsylvania Avenue in Washington D.C. to make two mortgage

payments: one in the amount of $4,400; the other in the amount of $25,000. On the subject line of his $4,400 check, McDevitt wrote "4/01/08 payment." On the subject line of his $25,000 check, McDevitt wrote "Deferred interest + pay off one year principal payments." McDevitt orally instructed employees at Wachovia Bank that he wanted the $25,000 check to be applied to future monthly payments as they would come due.[2]

Along with the two checks, McDevitt also submitted a payment coupon of the kind he normally used to mail his payments to Wachovia Mortgage. The payment coupon contained preprinted text reciting four payment options: (1) a "Minimum Payment" of $2,647; (2) an "Interest Only" payment of $3807.61; (3) a "Sched. Principal and Interest" payment of $4317.33; and (4) a "15-Year Pmt. Plan" payment of $6,499.93. See Affidavit of Robert M. McDevitt, Ex. C (photocopy of checks and payment coupon) [Dkt. No. 1-2].

---

[2]   Although Wachovia Bank could accept a payment on behalf of Wachovia Mortgage, it did not have access to the customer's mortgage account and could not make any decisions as to how a mortgage payment would be applied. However, McDevitt was not aware of the distinction between Wachovia Mortgage and Wachovia Bank. He believed that the "Wachovia" Bank branch that accepted his payments was the same "Wachovia" entity holding his mortgage, and was not told otherwise by the Wachovia Bank personnel with whom he dealt on April 14, 2008.

Next to these four options, the payment coupon included lines for McDevitt to specify: (1) the amount of his payment, (2) any "Additional Amount to go to Principal/Deferred Interest," and (3) the "Total Amount Enclosed." On the first line, McDevitt wrote "4,400" to indicate his payment amount. On the second line, McDevitt crossed out the words "Deferred Interest," left unchanged the word "Principal," and added the words "one year payments," such that (construed in the light most favorable to McDevitt) the text read "Additional Amount to go to Principal/ one year payments: $25,000" On the third line, he entered [$]29,400 for the total payment enclosed with his payment coupon.

McDevitt asked the Wachovia Bank personnel with whom he dealt for a receipt of his payment, and he received a single page photocopy of the two checks along with his payment coupon. The photocopy was date-stamped by Wachovia Bank and initialed by the branch manager.

### 3.   Wachovia's Application of the April 14 Payment

Wachovia Mortgage subsequently applied the $4,400 check to McDevitt's regular monthly payment and the $25,000 check to reduce his principal balance. When McDevitt received his monthly mortgage statement in June 2008, he learned that his $25,000 payment had not been held for future monthly payments,

-5-

as he requested, but applied to reduce his principal balance.
He then contacted Wachovia Mortgage to correct the application
of his payment, and was advised to "continue making payments
until we've resolved this." There is no evidence that McDevitt
made a record of the date on which this conversation took place
or the name of the individual with whom he spoke.

McDevitt continued to make his monthly mortgage payments
throughout all of 2008, 2009, and January 2010. During this
time, McDevitt made multiple telephone calls to Wachovia
Mortgage and Wells Fargo[3] and was given the same advice each
time: continue making his monthly payments until the application
of his $25,000 payment was resolved. Again, McDevitt did not
present evidence of the dates on which these conversations took
place, the names of the individuals with whom he spoke, or
whether such individuals worked for Wachovia Mortgage or Wells
Fargo.

In or around January 2010, McDevitt spoke by telephone with
a customer service representative who told him "Don't worry, its
handled" and implied that "[his] problem had been resolved."
This conversation left McDevitt with the impression that he was
not required to make any more loan payments for approximately 12

---

[3] In late 2009, Wachovia Mortgage was merged into Wells Fargo
Bank but continued to trade under the name Wachovia Mortgage.

months starting in early 2010, although Wells Fargo Bank did not send him anything in writing to confirm that his payment scheduled had been modified. As with the other telephone calls, McDevitt does not appear to have made any record of the date on which this conversation took place or the name of the individual with whom he spoke.

In February 2010, McDevitt stopped making his monthly mortgage payments.

### 4.   The Notice of Default

On February 22, 2010, Wachovia Mortgage wrote to McDevitt to advise him that his mortgage payment due February 1, 2010 had not been received. On March 18, 2010, Wachovia Mortgage again wrote to McDevitt, expressing concern that his loan was then two months in arrears, and proposing solutions to avoid foreclosure. On April 5, 2010, Wachovia Mortgage sent McDevitt notice that "Your loan has been approved for commencement of foreclosure action which may cause you to lose your property and any owner's equity." On June 4, 2010, Wachovia Mortgage sent McDevitt another letter advising him of his loan's delinquent status and providing information about the federal government's Home Affordable Modification Program. Wells Fargo, as successor to Wachovia Mortgage, then retained the law firm of Rosenberg & Associates ("Rosenberg") to commence foreclosure proceedings.

### 5.   The Foreclosure Proceedings

Rosenberg's first contact with McDevitt appears to have been through a "fair debt letter." The parties do not agree on when the fair debt letter was mailed, but stipulated that the letter was dated July 26, 2010, and that Michael Amos ("Amos"), the individual in charge of McDevitt's foreclosure file at Rosenberg, testified that the letter was drafted and mailed on July 26, 2010. The parties further stipulated that McDevitt did not receive the fair debt letter until September 2 or 3, 2010, only a few days before the foreclosure sale, which was scheduled for September 7.[4]

The fair debt letter advised McDevitt of his default and the amount then due on the Note. It also stated that if, "within thirty (30) days of receipt of this letter," McDevitt disputed all or a portion of the debt in writing, or requested the name and address of the original creditor, Rosenberg would cease collection of the debt until it obtained verification of the debt and ascertained the name and address of the original creditor.

On August 4, 2010, Rosenberg also sent McDevitt, by certified mail, a Notice of Foreclosure Sale of Real Property

---

[4] The parties proffer different theories as to why McDevitt did not receive the fair debt letter until September, but these theories are not material to the Court's analysis.

("foreclosure notice").  In fact, Rosenberg sent McDevitt two such notices, one addressed to "Occupant" and the other addressed to "Robert M. McDevitt."  The foreclosure notice advised McDevitt that, to satisfy his debt to Wells Fargo, his Property was to be sold at a foreclosure sale on September 7, 2010 at 10:13 a.m. See Ex. C to McDevitt's Mot. (Foreclosure Notice) [Dkt. No. 20-4].  However, McDevitt never received either of the foreclosure notices, and both were returned "unclaimed" by the U.S. Postal Service.  No definitive explanation was offered by either party as to why the notices were "unclaimed."

At 9:27 a.m. on the morning of the foreclosure sale, September 7, 2010, McDevitt emailed Rosenberg that he disputed the debt and requested the name of the creditor to whom the debt was owed.  However, the foreclosure sale went forward, and later that day, McDevitt's Property was sold at foreclosure to a third party for $510,000.  The next day, Amos responded to McDevitt's email, and sent him verification of the debt and the name of the creditor.

After the foreclosure, McDevitt continued to live at the Property pending various legal challenges, but ultimately was evicted in March 2012.  He had $142,876.56 of equity in the Property.

-9-

## B.   Procedural Background

On August 3, 2012, McDevitt filed his Complaint alleging claims for wrongful foreclosure, breach of contract, and negligent infliction of emotional distress.   [Dkt. No. 1]. Wells Fargo moved to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), which the Court denied on September 25, 2012 [Dkt. No. 12].   On February 28, 2013, after discovery, Wells Fargo filed a Motion for Summary Judgment [Dkt. No. 19], and McDevitt filed a cross Motion for Summary Judgment on Liability and Partial Summary Judgment on Damages [Dkt. No. 20].   On March 14, 2013, the parties each filed Oppositions [Dkt. Nos. 21, 22], and on March 28, 2013, they filed their Replies [Dkt. Nos. 23, 24].   On March 29, 2013, the Court denied the Motions in a one-page Order, and referred the parties to a Magistrate Judge for settlement.   [Dkt. No. 25].

On May 8, 2013, after unsuccessful settlement negotiations, the Court held a status conference and agreed to reconsider the parties' Motions for Summary Judgment.   The parties then filed an Amended Joint Statement of Stipulated Facts [Dkt. No. 31] to aid the Court in its reconsideration of the Motions.[5]

---

[5]   The parties have stipulated to these facts for purposes of summary judgment only.

## II. STANDARD OF REVIEW

Summary judgment may be granted if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Arrington v. United States, 473 F.3d 329, 333 (D.C. Cir. 2006). To prevail on such a motion, the moving party must demonstrate either that there is no "genuine" factual dispute, or that any such dispute is not "material" to the case. "A dispute over a material fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the non-moving party.'" Arrington, 473 F.3d at 333 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986)). A fact is "material" if it might affect the outcome of the case under the substantive governing law. Liberty Lobby, 477 U.S. at 248.

As the Supreme Court stated in Celotex Corp. v. Catrett, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at

trial." 477 U.S. 317, 322 (1986). The Supreme Court has further explained,

> When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no "genuine issue for trial."

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (footnote and citations omitted).

In other words, "'[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.'" Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Liberty Lobby, 477 U.S. at 247-48) (emphasis in original).

At the same time, the Supreme Court has also consistently emphasized that the judge's function on a motion for summary judgment is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Liberty Lobby, 477 U.S. at 249. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge" deciding a motion for summary judgment. Id. at 255; see also Reeves v. Sanderson Plumbing Prods., Inc., 530

-12-

U.S. 133, 150 (2000).   Therefore, summary judgment is only appropriate if the non-movant fails to offer any "evidence on which the jury could reasonably find for the [non-movant]." Liberty Lobby, 477 U.S. at 252.

In deciding a motion for summary judgment, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves, 530 U.S. at 150.   Ultimately, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52.

## III.  ANALYSIS

### A.   Wrongful Foreclosure

In Count I of the Complaint, McDevitt asserts a claim for wrongful foreclosure.   Under District of Columbia law, "an action for wrongful or improper foreclosure may lie where the property owner sustains damages by reason of a foreclosure executed in a manner contrary to law."   Johnson v. Fairfax Vill. Condo. IV Unit Owners Ass'n, 641 A.2d 495, 505 (D.C. 1994) (citation omitted).   In his Complaint, McDevitt asserted that Wells Fargo was liable for wrongful foreclosure because the Rosenberg firm did not send him written notice of foreclosure as

-13-

required under District of Columbia law.   Compl. ¶ 34 (citing
D.C. Code §§ 42-815; 42-815.01).   However, McDevitt now concedes
that Rosenberg did comply with the District of Columbia notice
provisions by sending him the foreclosure notice in August, even
if he never received it.   Pl.'s Opp'n at 20 [Dkt. No. 22].
Consequently, the disagreement between the parties as to the
date of mailing the notice of foreclosure is no longer material.

McDevitt now argues, however, that Rosenberg violated the
federal Fair Debt Collection Practices Act ("FDCPA") in failing
to halt the foreclosure sale on his Property after he disputed
the debt.   Id. at 21-23.   He further contends that this
violation may serve as the predicate for a wrongful foreclosure
claim under District of Columbia law because it resulted in his
foreclosure being "executed in a manner contrary to law."   Id.
at 23-27.

### 1.   Relevant Provisions of the FDCPA

The FDCPA provides, in relevant part, that in connection
with the collection of any debt, a debt collector must send
written notice to the debtor specifying the amount of debt, the
name of the creditor to whom it is owed, and a statement that,
within 30 days of receipt of the written notice, the debtor may
request certain information relating to debt.   15 U.S.C. §
1692g(a).   Further,

> [i]f the consumer notifies the debt collector in writing within [30 days of receipt of the notice] that the debt, or any portion thereof, is disputed, or that the consumer requests the name and address of the original creditor, the debt collector shall cease collection of the debt . . . until the debt collector obtains verification of the debt . . . or the name and address of the original creditor, and a copy of such [information] is mailed to the consumer by the debt collector.

15 U.S.C.A. § 1692g(b).

McDevitt contends that the Rosenberg firm violated section 1692g(b) of the FDCPA when it did not postpone the foreclosure sale after being notified that the debt was disputed, nor send him the requested information until the following day.

McDevitt does not cite, and the Court has not found, any case in which a plaintiff was permitted to use an FDCPA violation as a predicate for a claim for wrongful foreclosure under District of Columbia law.[6]  Even assuming, however, that a wrongful foreclosure claim may be based on a violation of the

---

[6] As McDevitt concedes, Pl.'s Opp'n at 25, courts considering claims for wrongful foreclosure have generally assumed that foreclosure is not wrongful where it complies with the District of Columbia notice provisions.  See, e.g., Kibunja v. Alturas, LLC, 856 A.2d 1120, 1123, 1129 (D.C. 2004) (assuming that law applicable to claim for wrongful foreclosure was District of Columbia notice statute where "main thrust of [plaintiff's case] was that they were not given adequate notice" of foreclosure sale) (citing Johnson, 641 A.2d at 504); Young v. 1st Am. Fin. Servs., 992 F. Supp. 440, 445 (D.D.C. 1998) (reasoning that where "defendants did not violate [D.C. notice statute] . . . any foreclosure that occurred was not wrongful").

FDCPA, an issue the Court need not reach, McDevitt's claim fails
because Wells Fargo is not a proper defendant under the FDCPA.

### 2.    The FDCPA Only Applies to "Debt Collectors"

With one exception, not applicable here, the FDCPA applies
only to "debt collectors," defined as persons whose principal
business is the collection of debt or who "regularly collect[] .
. . debts owed or due or asserted to be owed or due another."
15 U.S.C. § 1692a(6).   A creditor, such as Wells Fargo, by
contrast, is not a debt collector and is not subject to the
FDCPA unless it acquires a debt in default solely for the
purpose of facilitating collection of such debt.   See 15 U.S.C.
§ 1692a(4), (6).   Because the parties agree that Wells Fargo
acquired McDevitt's debt in 2009 as part of a merger with
Wachovia Mortgage, and that McDevitt's loan was not in default
at that time, Wells Fargo indisputably is a creditor, not a
"debt collector."

McDevitt devotes much of his papers to the question of
whether the Rosenberg firm is a "debt collector."   However,
Rosenberg's status as a debt collector is immaterial unless
Wells Fargo may be held vicariously liable for the firm's debt
collection activities.   McDevitt presents no evidence suggesting
Wells Fargo had the right to control Rosenberg in its
foreclosure activities, which is an essential prerequisite to

-16-

any claim based on vicarious liability. See, e.g., Moorehead v. Dist. of Columbia, 747 A.2d 138, 146 (D.C. 2000) (relationship based on control "is the decisive factor in vicarious liability analysis").[7]

Therefore, McDevitt cannot bring such an FDCPA claim against Wells Fargo because, as a matter of law, the FDCPA does not apply to Wells Fargo in its capacity as a creditor.[8] Accordingly, summary judgment shall be granted in favor of Wells Fargo on Count I.

### B.   Breach of Contract

In Count II of the Complaint, McDevitt asserts a claim for breach of contract.   The interpretation of a facially clear

---

[7]   It also is questionable whether a creditor that is not also a debt collector may ever be held vicariously liable under the FDCPA.   See, e.g., Wadlington v. Credit Acceptance Corp., 76 F.3d 103, 108 (6th Cir. 1996) ("We do not think it would accord with the intent of Congress . . .   for a company that is not a debt collector to be held vicariously liable for a collection suit filing that violates the Act only because the filing attorney is a 'debt collector.'"); Townsend v. Fed. Nat. Mortg. Ass'n, No. 3:12-cv-00045, 2013 WL 549263, at *10 (W.D. Va. Feb. 12, 2013) ("[C]reditors [may not] be held vicariously liable for FDCPA violations by independent debt collectors acting on their behalf.") (citation omitted).   The Court of Appeals in this Circuit has not yet addressed this issue.

[8] Further, as Wells Fargo points out, McDevitt most probably is time-barred from bringing any claim under the FDCPA itself because the FDCPA has a one-year statute of limitations for civil actions.   See 15 U.S.C. § 1692k(d).   However, it is not necessary to reach this issue in light of the Court's ruling above.

contract is a question of law to be resolved by the court.  See,
e.g., NRM Corp. v. Hercules, Inc., 758 F.2d 676, 682 (D.C. Cir.
1985).  Thus, where a contract is unambiguous, summary judgment
is appropriate, "'since, absent such ambiguity, a written
contract duly signed and executed speaks for itself and binds
the parties without the necessity of extrinsic evidence.'"
Angulo v. Gochnauer, 772 A.2d 830, 834 (D.C. 2001) (citation
omitted).  A contract is ambiguous when "the provisions in
question are reasonably susceptible of different constructions
or interpretations."  1901 Wyoming Ave. Co-op. Ass'n v. Lee, 345
A.2d 456, 461 n.7 (D.C. 1975).

McDevitt argues that Wells Fargo's Motion should be denied
because the parties dispute: (1) how often a payment needed to
be made under the contract, (2) "the mechanism for contract
alterations," and (3) whether his $25,000 payment was applied
properly.  Pl.'s Opp'n at 15, 16, 18.[9]  However, as discussed
below, the Note unambiguously required McDevitt to make monthly
payments, and further required that any modifications to his
payment schedule be made in writing.  Therefore, the Court may
resolve the first two disputes as a matter of law.  Because

---

[9]  McDevitt also argues that the parties dispute why he stopped
making his mortgage payments, Pl.'s Opp'n at 19, but McDevitt's
motivation for not paying his mortgage is immaterial to the
legal issues presented in the Motions.

there is no genuine dispute that McDevitt stopped making his monthly payments without obtaining the Bank's agreement in writing, the third issue is not relevant to disposition of the claim.

### 1. The Note Required McDevitt to Make Payments Every Month

McDevitt first argues that although he failed to make payments in February through September of 2010, he was not in default because his advance payment of $25,000 in April 2008 satisfied the payments otherwise due for that period of time. McDevitt contends that his action was consistent with Paragraph 3 of the Note, which he construes to mean that so "long as a borrower . . . submitted a payment for each month," the borrower was not literally required to make a payment each month. Pl.'s Opp'n at 15. (emphasis in Pl.'s Opp'n)

However, the Note does not require payments "for" every month. It clearly states that McDevitt was required to "pay Principal and interest by making payments every month[,] . . . on the 1st day of each month," and "every month [thereafter] until [he had] paid [ ] all the Principal and interest[.]" Note ¶ 3 (emphasis added). This language does not merely set the

total dollar amount which McDevitt was to have paid off, it also dictates the precise frequency and timing of each payment.[10]

Moreover, Paragraph 5 addressed how, if at all, McDevitt's payment schedule would be affected in the event he made an advance payment. It states:

> IF I MAKE A PARTIAL PREPAYMENT, THERE WILL BE NO CHANGES IN THE DUE DATES OR AMOUNTS OF MY PAYMENTS UNLESS THE LENDER AGREES IN WRITING TO THOSE CHANGES.

Therefore, McDevitt's argument that his advance payment relieved him of the obligation to make future monthly payments is inconsistent with the plain language of the Note, which literally required payments "each" and "every" month for the life of the loan, regardless of any prepayments, unless the lender agreed otherwise in writing.

### 2.   The Writing Requirement Was Not Modified by the Bank's Conduct

McDevitt also argues that "despite whatever the loan agreements said[,] the Bank's actual practice was to simply alter [the contract's] terms verbally at McDevitt's request[.]" Pl.'s Opp'n at 17.   McDevitt points to instances in which the Bank orally agreed to waive his late fees.   From these

---

[10] McDevitt appears to have had a limited right to pay less than the full amount of interest due each month, with the result that any deficiency would be added to his principal balance as deferred interest.   See Note ¶ 3(E)-(F).   This feature of the Note is not at issue.

occasions, he reasons that "a reasonable juror could infer that [his payment schedule had been verbally modified because] the Bank granted . . . special accommodations verbally and as a matter of course." Id.

However, McDevitt does not articulate any legal theory by which the Bank's verbal waiver of late fees on a case-by-case basis affected its future right to require that any modifications to his payment schedule be in writing. McDevitt suggests that the Bank's waiver of late fees is relevant because "the contract between the parties left out important details and policies, leaving them to be determined outside the contract as they arose." Id. This argument is simply incorrect as it relates to his payment schedule. As discussed above, the Note did not "le[ave] out important details" regarding McDevitt's payment schedule or the manner in which it would be modified. Therefore, McDevitt may not use extrinsic evidence in an attempt to contradict the Note's plain and unambiguous terms.

To the extent McDevitt is arguing that the Bank's conduct over the course of the loan somehow waived the writing requirement in its entirety, he is also incorrect. While a party may waive its rights under a contract, a court will not infer waiver from the party's conduct absent a "'clear, unequivocal and decisive act of the party who is claimed to have

-21-

waived its rights, so consistent with an intention to waive that no other reasonable explanation is possible.'" <u>Kersey v. Washington Metro. Area Transit Auth.</u>, 533 F. Supp. 2d 181, 196 (D.D.C. 2008) (quoting 13 Williston on Contracts § 39:28 at 626-27 (4th ed. 2000)). The Bank's occasional oral waiver of late fees is not evidence — and certainly is not clear, unequivocal and decisive evidence — that the Bank abandoned the right at issue in this case, namely that McDevitt's monthly payment schedule could not be changed unless the Bank agreed in writing to any such change.

McDevitt concedes that "no writing exists now or has existed altering the contract's terms." Pl.'s Opp'n at 17. Therefore, for all the foregoing reasons, the Court shall, as a matter of law, grant summary judgment in favor of Wells Fargo on Count II.

### C.   Negligent Infliction of Emotional Distress

Finally, in Count III, McDevitt asserts a claim for negligent infliction of emotional distress. Under District of Columbia law,

> [A] plaintiff may recover for negligent infliction of emotional distress if the plaintiff can show that (1) the defendant has a relationship with the plaintiff, or had undertaken an obligation to the plaintiff, of a

nature that necessarily implicates the plaintiff's
emotional well-being, (2) there is an especially
likely risk that the defendant's negligence would
cause serious emotional distress to the plaintiff, and
(3) negligent actions or omissions of the defendant in
breach of that obligation have, in fact, caused
serious emotional distress to the plaintiff.

Hedgepeth v. Whitman Walker Clinic, 22 A.3d 789, 810-11

(D.C. 2011).

The parties devote most of their papers to the
question of whether Wells Fargo and its predecessors in
interest undertook any special relationship with McDevitt
that satisfies the first prong of the test set forth in
Hedgepeth. Wells Fargo argues that it had no duty to avoid
negligent infliction of emotional distress because the
nature of its relationship with McDevitt was purely
contractual. Def.'s Mem. P & A at 19-22. In particular,
it notes Hedgepeth's statement that a duty to avoid the
negligent infliction of emotional distress generally does
not arise where the purpose of a particular relationship or
undertaking is not "to care for the plaintiff's emotional
well-being [but] to obtain a financial, commercial or legal
objective, even if its non-attainment due to [the
defendant's] negligence is emotionally distressing to the
[plaintiff]." Hedgepeth, 22 A.3d at 815 (citations

-23-

omitted).   This language squarely covers the facts of this case.

Even assuming the Bank did owe McDevitt a duty to avoid negligent infliction of emotional distress, McDevitt has not put forth any evidence that the Bank ever breached it.   McDevitt suggests only two theories by which he seeks to hold the Bank liable for negligent infliction of emotional distress.

First, he contends that the Bank was negligent in failing to apply his $25,000 payment in the manner he directed.   See Compl. ¶ 46.   This theory merely restates his breach of contract claim, and does not give rise to a separate claim for negligence.   Cf. Choharis v. State Farm Fire and Cas. Co., 961 A.2d 1080, 1089 n.12 (D.C. 2008) (allegation of negligent performance of insurance contract "does not mean that there is a separate cause of action sounding in tort for negligence, but rather that the [plaintiff] may recover damages therefor under a breach of contract theory") (citing Myers v. Firemen's Ins. Co. of Washington, D.C., 274 F.2d 84, 86 (D.C. Cir. 1959)).

Second, McDevitt suggested in his Opposition to Defendant's Motion for Summary Judgment that the Rosenberg firm was negligent for failing to send him proper notice of

-24-

the foreclosure sale or for "wrongfully foreclosing on [his] home."   Pl.'s Opp'n at 31; see also Compl. ¶¶ 45-47. However, McDevitt now concedes that the firm did send him notice of foreclosure more than a month before the foreclosure sale; he just didn't receive it.

Even assuming McDevitt has raised a genuine issue of fact that Rosenberg was negligent in failing to mail the fair housing letter in a timely fashion, he still has not set out any basis on which a jury could find Wells Fargo liable for the firm's purported negligence.   Although he recites the general rule that "[u]nder standard agency principles, [a] principal is liable for the negligence of its agent," he does not cite any case in which a client was held vicariously liable for the negligence of its attorney. Pl.'s Opp'n at 30.

Further, the weight of authority provides that a client generally is <u>not</u> vicariously liable for its attorney's torts, absent evidence that the client directed, controlled, authorized, or ratified the attorney's allegedly tortious conduct.   See Horwitz v. Holabird & Root, 212 Ill.2d 1, 12-14 (Ill. 2004) ("[W]hen attorneys act pursuant to the exercise of independent professional judgment  .   .   .   they are presumptively independent

-25-

contractors for purposes of imposing vicarious liability.")
(citing cases); <u>Givens v. Mullikin ex rel. Estate of
McElwaney</u>, 75 S.W.3d 383, 398 (Tenn. 2002) ("'Unless a
client is implicated in some way other than merely being
represented by the attorney . . . the client cannot be
liable for the attorney's conduct.'") (quoting <u>Bradt v.
West</u>, 892 S.W.2d 56, 76-77 (Tex. App. 1994)).

As discussed earlier, McDevitt points to no evidence
suggesting that Wells Fargo had any input into, or control
over, the manner in which the Rosenberg firm conducted the
foreclosure proceedings.   Further, McDevitt does not
suggest any way in which Wells Fargo may have been
negligent in selecting Rosenberg as its foreclosure
counsel.  Accordingly, even assuming Wells Fargo did have a
duty to McDevitt to avoid the negligent infliction of
emotional distress, there is no basis on which a reasonable
jury could find by a preponderance of the evidence that
Wells Fargo breached its duty, or is vicariously liable for
any purported negligence of Rosenberg.

As the Supreme Court said in <u>Liberty Lobby</u>, summary
judgment should be granted where there is no "evidence on
which the jury could reasonably find for the plaintiff."

477 U.S. at 252.   Therefore, the Court shall grant summary judgment in favor of Wells Fargo on Count III.

**IV.   CONCLUSION**

For the foregoing reasons, Wells Fargo's Motion is **granted**, and McDevitt's Motion is **denied**.   An Order shall accompany this Memorandum Opinion.

May 29, 2013

Gladys Kessler
United States District Judge

**Copies to:** attorneys on record via ECF